**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| PAMELA ANN CONDON,<br><br>       Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social<br>Security,<br><br>       Defendant. | **No. 09-CV-3077-DEO**<br><br>**MEMORANDUM OPINION AND ORDER REGARDING COMMISSIONER'S DENIAL OF BENEFITS** |

_____

**TABLE OF CONTENTS**

**I. FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . 4

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . 16

Pamela Condon seeks disability benefits. The Administrative Law Judge's[1] (ALJ) February 13, 2009, decision found her ineligible. This Court reverses the decision of the ALJ and awards benefits.

**I. FACTS**

Ms. Condon filed an application for Disability Insurance Benefits (DIB) on October 23, 2006, claiming to be disabled since January 15, 2006.[2] Condon's date of birth is February

---

[1] The Hon. Thomas M. Donahue.

[2] Regarding her claim for DIB, Condon remains insured through December 31, 2009, and must therefore establish disability on or before that date to be entitled to DIB. Tr. 10, 98.

3, 1954. Condon alleges she is disabled because of dermatomyositis,[3] lymphedema,[4] hyperparathyroidism,[5] and hypercalcemia.[6] Condon is a breast cancer survivor. As part

---

[3] Dermatomyositis is a connective tissue disease characterized by muscle inflammation and severe skin rashes. Stedman's Medical Dictionary 519 (28th ed. 2006). Symptoms of the disease include difficulty swallowing; muscle weakness, stiffness, or soreness; purple or violet-colored upper eyelids; purple-red skin rashes; and shortness of breath. MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000839.htm. Some sufferers of the disease develop a rash without muscle weakness; this is called dermatomyositis sine myositis. PennState College of Medicine, Health & Disease Information, http://www.hmc.psu.edu/healthinfo/d/dermatomyositis.htm. Dermatomyositis is a progressive disease, meaning it is generally expected to worsen and spread over time. Stedman's at 1571.

[4] Lymphedema is the build-up of fluids in the body due to obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region. Stedman's at 1127; MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000045.htm. "It can cause an arm or leg to swell up and become painful." Id. MedlinePlus.

[5] Hyperparathyroidism is a condition caused by excessive production of parathyroid hormone (PTH) by the parathyroid glands. Stedman's at 924; MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001215.htm. Symptoms of the condition include back pain, blurred vision, bone pain or tenderness, decreased height, depression, fatigue, fractures of long bones, increased urine output, increased thirst, itchy skin, joint pain, loss of appetite, nausea, muscle weakness and pain, personality changes, stupor and possibly coma, and upper abdominal pain. Id. MedlinePlus.

[6] Hypercalcemia is excessive calcium in the blood, sometimes due to cancerous tumors or primary hyperparathyroidism. Stedman's at 918; MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000365.htm.

2

of her treatment regimen, she underwent a bone marrow transplant. This procedure weakened her immune system. Her already-compromised immune system is further suppressed by methotrexate,[7] a powerful immunosuppressive drug she takes to control her skin disease. At the second step of the sequential evaluation, the ALJ found Condon suffered from "dermatomyositis (with sun sensitivity)[] [and] moderate to severe osteopenia[8] of the lumbar spine and femur bilaterally," a combination of impairments which the ALJ found to be severe. Tr. 12. At step 4 of the sequential evaluation, the ALJ found Condon retains the residual functional capacity (RFC) to perform her past relevant work as a waitress and coffee shop manager. The ALJ nevertheless continued to step 5 and found,

---

[7] Methotrexate "should only [be used] to treat life-threatening cancer, or certain other conditions that are very severe and that cannot be treated with other medications. MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html. While often referred to as an "immunosuppressive" drug, methotrexate is part of a recently defined class of drugs called Disease Modulating Anti-Rheumatic Drugs (DMARDS) that "affect the underlying disease by suppressing the immune system." Ann G. Hirschman, Medical Proof of Social Security Disability § 14:12 (2nd ed. 2008). "These heavy hitters are all used only for people who have failed any other treatment. The side and toxic effects can include suppression of the immune system to the point that fatal infections occur, bone marrow suppression to the point of fatal anemia, liver damage, kidney damage, brain and nervous system damage and a host of other nasty things." Id.

[8] Osteopenia is the decreased calcification or density of bone. Stedman's at 1391.

in the alternative, that, given her age, education, work experience, and RFC, Condon has acquired work skills from past relevant work (PRW) that are transferable to other occupations with jobs existing in significant numbers in the national economy.

## II. DISCUSSION

The ALJ's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); see also Kluesner v. Astrue, 607 F.3d 533, 536 (8th Cir. 2010). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" Kluesner, 607 F.3d at 536 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). This standard of review requires the reviewing court to consider both evidence that supports the ALJ's decision as well as evidence that detracts from it. 607 F.3d at 536. However, the court may not reverse the ALJ's decision simply because substantial evidence exists in the record that would have supported a different outcome, or because the court would have decided the case differently. Id.; Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001) (citations omitted). Rather, "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). In short, a reviewing court should neither consider a claim de novo, nor abdicate its duty to carefully analyze the entire record. Wilcutts v. Apfel, 143 F.3d 1134, 1136-37 (8th Cir. 1998) (citation omitted).

The Court has considered all of the record evidence — both that which supports the ALJ's decision and that which detracts from it — however only that evidence which the Court considers most material will be discussed in this Opinion. As explained below in further detail, the evidence in this record is fully favorable to a finding of disability.

In the opinion of the Court, this case turns on the proper evaluation of the treatment notes and medical opinions of Ms. Condon's treating rheumatologist, Dr. Mark Burdt, DO, concerning the functional effects of Ms. Condon's severe conditions and the side effects of her medications.[9] Dr. Burdt's notes concerning these issues are consistent

---

[9] Condon's brief provides "[t]he primary care physician in this case is Dr. Birkett, MD. . . . Ms. Condon is [also] being followed . . . by Dr. Burdt." Docket No. 9 at 6. However, as the Government correctly notes, "[t]he medical evidence of record fails to reveal appointments with Dr. Birkett during the relevant time period." Docket No. 10 at 13.

5

throughout: Condon suffers from dermatomyositis, an inflammatory muscle disease which in her particular case manifests itself in the form of facial swelling and rashes that look like patchy, reddish to bluish-purple discolorations on her face, scalp, neck, arms, hands, chest, legs, and back; although these symptoms have at times been brought under control with various combinations of high-dose corticosteroids and immunosuppressive drugs, the numerous side effects of the powerful drug cocktails that enable such control in Condon's case — nausea, fatigue, upset stomach, loss of appetite, labored breathing, marked hair loss, and explosive and unpredictable diarrhea — all but outweigh the benefits of her treatment; and while her drug regimen continues to be modified to maximize therapeutic benefits while minimizing side effects, nearly all attempts thus far at minimizing side effects have resulted in significant worsening of her skin disease.[10] Unfortunately, the record of her most recent

---

[10] For example, Dr. Burdt's notes from a January 2007 appointment with Condon provide:

> I was trying to make a therapeutic interchange from methotrexate to azathioprine due to problems with hair loss and diarrhea related to methotrexate . . . [but] [t]his caused significant worsening of her skin disease despite getting her up to a dosage of 100 mg of azathioprine in conjunction with 10 mg of methotrexate.

6

appointment with Dr. Burdt reflects that Condon's current drug regimen, though still effective in controlling the symptoms of her dermatomyositis, continues to produce severe side effects, the most troubling of which is diarrhea.[11]  Tr. 600 (appointment to address "a litany of complaints"). Although not asked to provide an opinion on the issue, Dr. Burdt's notes from February 22, 2007, provide "[Ms. Condon] clearly is disabled based upon her social phobia from her skin disease, her marked pruritus, her side effects from the prednisone and the methotrexate, particularly the diarrhea." Tr. 624.

In his decision, the ALJ indirectly referenced some of Dr. Burdt's notes, but the bulk of his discussion of the evidence concerning Condon's skin disease and associated impairments was dedicated to discrediting Dr. Burdt's opinion

---

Tr. 558, 625.

[11] At the appointment, Condon reported suffering from diarrhea about three times per week, though she described each "time" she suffered diarrhea as a roughly 24-hour period of frequent loose stools. Tr. 600. Dr. Burdt addressed these complaints by adjusting her methotrexate and folic acid. Id. He previously directed her to use Immodium-AD as needed. Tr. 624. Other severe side effects Condon continues to suffer include fatigue, headaches, and muscle cramping, though it is unclear whether these relate to Condon's current drug regimen. Fatigue is a known side effect of both dermatomyositis (MayoClinic.com, http://www.mayoclinic.com/health/dermatomyositis/DS00335/DSECTION=symptoms) and methotrexate (PubMed.gov, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000547). Condon testified Dr. Burdt believed her fatigue was caused by her dermatomyositis. Tr. 28.

7

that this disease and the side effects of the medications used to treat it rendered Condon disabled.

Regarding his rationale for rejecting Dr. Burdt's opinion, first the ALJ selectively referenced treatment notes from July 2006 and September 2006 purportedly showing Condon's drug regimen adequately controlled her skin disease "without any significant complications." See Tr. 14. But these notes cannot bear the weight placed on them by the ALJ.

For example, while the July 2006 notes do reflect "marked improvement" in Condon's skin condition, such improvement must be viewed in the context of her last appointment — at which time she was reportedly "doing poorly," "feeling horribly," and "look[ing] horrible" (Tr. 312) — not to mention the fact that the notes also reflect new complaints of dyspnea (shortness of breath),[12] early satiety (feeling full sooner than normal or after eating less than usual), headaches, and nausea, all of which may have been harbingers of the side effects she now alleges render her incapable of working. Tr. 314. And although the September 2006 notes do provide Condon was at that time "[d]oing very well with a low-dose combination of methotrexate and [p]laquenil," they also

---

[12] Although Condon first complained of shortness of breath *to Dr. Burdt* at their July 2006 appointment, the record reflects she first complained of this to Dr. Dawn Peterson on June 9, 2006. Tr. 347.

8

reflect that such control of her dermatomyositis symptoms came at a high price: the methotrexate was causing "[m]arked hair loss" and would have to be lowered in dosage or discontinued altogether unless the hair loss could be controlled by adjusting the dosage of one of her supplements. Tr. 323. However, Dr. Burdt's notes concerning Condon's next visit in November 2006 provide that, "[w]ith dropping down to 5 mg of methotrexate [(in an effort to minimize her severe hair loss and diarrhea)], she has had significant worsening of her skin disease . . . ." Tr. 486. The ALJ did not mention this or any of the other records discussed above showing that, despite repeated adjustments to Condon's drug regimen, Dr. Burdt was unable to identify a combination of drugs that could control the symptoms of Condon's skin disease without causing severe side effects. See supra footnotes 10, 11, and 13 and accompanying text.

The ALJ also erred in finding Dr. Burdt's opinion did not conform to "his own longitudinal treatment history of [Condon] that was routine and conservative management through 2007 and 2008 with continued improvement and mild symptomology." Tr. 17. In support of this finding, the ALJ noted that "no medical evidence of record [shows] more aggressive treatment has been proposed" and that Dr. Burdt himself indicated "[Condon] does not have the full range or severity of symptoms

9

normally associated with dermatomyositis." Tr. 15-16. In the opinion of the Court, this is simply the ALJ's attempt to substitute his opinion for that of Ms. Condon's treating rheumatologist. See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (stating "the ALJ ignored the law of this circuit, which states that the ALJ must not substitute his opinion for those of the physician."). Furthermore, even if the ALJ were qualified to substitute his opinion for Dr. Burdt's in this manner, he would be wrong for several reasons.

To begin with, there is nothing "routine" or "conservative" about Condon's longitudinal treatment under Dr. Burdt, which involved a constantly changing regimen of highly toxic drugs of last resort, and which never led to any improvements in the symptoms of her skin disease that were not accompanied by further worsening of medication side effects.[13]

---

[13] Indeed, the record reflects a dwindling sense of hope on the part of Dr. Burdt and Condon that a drug regimen that could control the symptoms of Condon's skin disease without causing severe side effects would ever be found. Treatment notes show that by January 2007, for example, it had become clear that the severe side effects caused by Condon's drug regimen represented the price she would have to pay to control the symptoms of the disease:

> I was trying to make a therapeutic interchange from methotrexate to azathioprine due to problems with hair loss and diarrhea related to methotrexate. This caused significant worsening of her skin disease . . . . She would like to increase her dose of methotrexate and states she is

10

This would seem to indicate Dr. Burdt provided aggressive, rather than conservative treatment. And contrary to the ALJ's assertion, the fact that neither Dr. Burdt, nor any other physician in the lengthy record, has recommended more aggressive treatment would seem to suggest no more aggressive treatment options exist.

Finally, the ALJ's statement that "[Condon] does not have the full range or severity of symptoms normally associated with dermatomyositis because she has not had problems with myalgias[14] [sic] or any muscle weakness" (Tr. 15) reflects his misunderstanding of Condon's specific condition, dermatomyositis *sine myositis*, a form of dermatomyositis that

---

        willing to put up with the alopecia [(hair
        loss)]. I think this is reasonable.

Tr. 558, 625. By then Methotrexate had already proven to be effective in controlling Condon's skin disease, but as the foregoing passage shows Dr. Burdt had sought to augment or replace it with another drug with less severe side effects. Dr. Burdt again increased Condon's dosage of methotrexate at their next appointment one month later, explaining in his notes that, although Condon had experienced "explosive, intermittent diarrhea which is just really not predictable" following the increase in dosage at their last appointment, he felt they should "limit [their] losses" and focus on controlling the disease with even more of the drug despite the worsening in both hair loss and diarrhea the increase in dosage was expected to cause. Tr. 624. It was on this occasion Dr. Burdt opined "[Condon] clearly is disabled . . . ." Id.

[14] Myalgia means muscle pain. Stedman's at 1265.

11

does not involve the muscle weakness normally associated with the disease. See supra footnote 3 on page 2.

The ALJ afforded greater weight to the opinions of non-examining state agency physicians than to Dr. Burdt's opinion on the basis that he found those opinions "internally consistent" and "consistent with the evidence as a whole," and because "[t]he limitations noted by the examiners for a range of light-duty work are well supported with specific references to medical evidence."[15] Tr. 16. The Court disagrees. As Condon observes, these consultants did not have the complete medical record in this case when they rendered their opinions, a fact made apparent from their assertions that Condon was doing well on her medications without significant side effects. Tr. 231. Dr. Burdt's notes repeatedly reference Condon's severe side effects, particularly diarrhea, and his numerous, but ultimately unsuccessful attempts at mitigating these. And, while the consultants do refer to snippets of the incomplete record then before them in the "additional comments" section of their reports, the consultants failed to describe how the evidence supported any of their specific findings regarding Condon's limitations, as the directions on these forms clearly instructed them to do. See, e.g., Tr.

---

[15] The ALJ adopted the specific limitations noted by the state agency physicians and incorporated them into his RFC finding. Tr. 16, 549-56.

549. They also failed to follow the form's directions to "[r]equest[] appropriate treating and examining source statements regarding the individual's capacities" and to respond to all alleged limitations, which in Condon's case would have included medication side effects. Id. Moreover, it bears mentioning that Dr. Burdt is a specialist, while the consultants are merely general practitioners. See Tr. 595-96. In short, the ALJ erred by relying on the opinions of non-treating, non-examining, non-specialist medical consultants who relied on some, but not all of the available records of the treating sources to form an opinion of Ms. Condon's RFC. Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (stating that the "opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999))).

The ALJ also erred in his assessment of Condon's credibility. For example, the ALJ discredited Condon's testimony that she has a weakened immune system as a result of, among other things, her previous treatment for cancer on the basis that such treatment occurred "years ago," and also because the record failed to show that her doctors had ever warned her to stay out of public. Tr. 16. However, the ALJ

13

is not qualified to determine the medical relevance of these matters, and in any event one need not possess medical expertise to credit Condon's allegation; that Condon has a weakened immune system can be readily inferred from the fact that she is treated for an *autoimmune disease*[16] (her skin condition) by a *rheumatologist*[17] who prescribes and monitors her use of *immunosuppressive drugs*[18] like methotrexate. The ALJ also discredited Condon's extensively documented complaints of frequent, unpredictable diarrhea based on his finding that "she has shown improvement on medication and [has achieved] adequate control of her symptoms with conservative treatment." Tr. 16. While it is true that Condon's skin condition improved through the administration of immunosuppressive drugs, the Court is at a loss as to how, exactly, such improvement undermines Condon's complaints concerning diarrhea, or for that matter any other alleged side

---

[16] "An autoimmune disorder is a condition that occurs when the immune system mistakenly attacks and destroys healthy body tissue." MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000816.htm.

[17] Rheumatologists are doctors who specialize in the treatment of, among other things, autoimmune diseases. See American College of Rheumatology, http://www.rheumatology.org/practice/clinical/patients/rheumatologist.asp.

[18] Immunosuppressive drugs are drugs that inhibit or prevent activity of the immune system. Stedman's 955; see also supra footnote 7 on page 3.

effects of her medications. Condon consistently complained of frequent, unpredictable, and often explosive diarrhea after first reporting the side effect in November 2006. Condon's complaints of diarrhea are extensively documented in the medical record and are further evidenced by repeated adjustments to her immunosuppressive medications, prescriptions for anti-diarrheal drugs, and other measures suggested by her rheumatologist to alleviate this severe side effect. See supra footnotes 10, 11, and 13 and accompanying text.

The ALJ failed to incorporate the functional impact of these and other adequately documented side effects in his RFC finding. Consequently, the hypothetical question posed to the Vocational Expert (VE) on which the ALJ based his RFC finding was deficient.

Although the Government maintains the ALJ's decision should be affirmed, it asserts that if the Court identifies errors in the decision the proper remedy is remand. However, based upon the Court's review of the record, and having given due deference to the ALJ's findings, the Court can discern no reason for delaying this case further. The clear weight of the evidence overwhelmingly points to a conclusion that Condon

is disabled.[19] Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001) ("'Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.'" (quoting Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984))).

### III. CONCLUSION

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is **REVERSED**, and the Commissioner is directed to compute and award disability benefits to Condon with an onset date of February 22, 2007. The Court is persuaded that the medical evidence unequivocally indicates that by this date Condon could not engage in competitive employment on a sustained basis. No medical evidence demonstrates subsequent improvement sufficient to enable Condon to engage in such work on a sustained basis. The Court therefore finds that, as of this date, Condon was disabled.

Application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, unless this decision is appealed, if Condon's

---

[19] The Court notes that when the VE was presented with a hypothetical which incorporated the functional impact of Condon's diarrhea, the VE testified all work would be precluded. See Tr. 36-37.

16

attorney wishes to apply for EAJA fees, then he must do so within thirty (30) days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 2nd day of February, 2011.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa